UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| JANET GOOD FACE, | ) | CIV.  07-4162-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING DECISION |
| MICHAEL J. ASTRUE, Commissioner, | ) | OF COMMISSIONER |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Janet Good Face, applied for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act on June 9, 2004.  Good Face seeks summary judgment reversing the Commissioner's decision denying her claim.  The court reverses and remands the Commissioner's decision.

**PROCEDURAL HISTORY**

Good Face applied for DIB on June 9, 2004, and SSI on June 14, 2004. In both applications, she alleged disability beginning January 15, 2002.  The claims were denied initially on August 25, 2004, and upon reconsideration on September 21, 2004.  Good Face timely requested a hearing, which took place before Administrative Law Judge Robert Lyle Olson (ALJ Olson) on September 1, 2005.  At this hearing, Good Face amended her alleged disability onset date to May 16, 2004.  ALJ Olson issued a decision affirming the denial

of benefits on January 21, 2006.  Good Face appealed and requested review of this decision.  The Appeals Council denied this request on August 1, 2006. Good Face filed a complaint in the United States District Court for the District of South Dakota seeking reversal of the denial of DIB and SSI on September 8, 2006.  On October 11, 2006, the Appeals Council vacated its prior action of August 1, 2006, and remanded the case for further proceedings.  In light of this action, the district court dismissed Good Face's complaint on February 6, 2007.  Good Face's second hearing took place on March 19, 2007, before Administrative Law Judge Robert Maxwell (the ALJ).  On May 8, 2007, the ALJ issued a decision finding that Good Face had not been under a disability within the meaning of the Social Security Act since May 16, 2004, and consequently was not entitled to DIB or SSI payments.  The Appeals Council denied Good Face's request to review the ALJ's decision on October 17, 2007.

## FACTS

Good Face was born on May 25, 1962, making her 41 years old on the alleged disability onset date and 44 years old at the time of the ALJ's decision. AR 470.  She graduated from high school and earned an associate's degree in radiology.  AR 470-71.  Before her alleged disability onset date of May 16, 2004, Good Face had been a general clerk at a convenience store.  AR 471. The store manager reports that she was always on time and was a cheerful, loyal, and dependable employee.  Her attendance record was exceptional, and

she did not require frequent breaks, rest periods, or time off for health reasons. AR 147-49.  Good Face has also worked as a motel cleaner, a restaurant hostess, a phlebotomist, a medical assistant, and an office assistant.  AR 471-73, 174.

Good Face shares her home in Flandreau, South Dakota, with her daughter, who is a college student in Lawrence, Kansas.  AR 491.  Good Face's daughter spends most of her time in Kansas, but returns to Flandreau for weekends, breaks, and holidays.  AR 492.  Good Face divorced in November 2004.  AR 416.  She has several cats and dogs.  AR 341.  She has a driver's license.  AR 500.

Good Face's friend, Valeria Wasson, reported on July 4, 2004, that Good Face goes to therapy and then stays home the rest of the day.  Wasson indicated that she helps Good Face do things like paperwork and housecleaning.  According to Wasson, Good Face needs assistance from her family or Wasson to dress herself, bathe, care for her hair, and shave.  AR 151. Good Face can feed herself and use the toilet without assistance, but does not cook.  AR 152.  Wasson reported that Good Face does not do household chores, cannot drive, and cannot walk long distances.  Good Face relies on her daughter or Wasson to get places and does not do her own shopping.  AR 152-53.  Wasson reported that Good Face needs help remembering to attend appointments and remembering which medications to take.  AR 153.  Wasson

3

reports that Good Face has not done any sewing since her May 2004 heart surgery and talks on the phone rather than leaving home to visit friends. AR 154. According to Wasson, Good Face can walk no more than a hundred feet before needing to rest for 10-15 minutes. AR 155.

Good Face's sister, Carol Shead-Gonzalez, who lives in Kansas, reported on July 8, 2004, that Good Face has no problems with personal care. She can dress and bathe herself. Good Face prepares cereal and sandwiches, but can no longer work, cook, clean, or drive long distances. AR 159-60. She does not do any household chores. AR 160-61. Shead-Gonzalez reported that Good Face can drive, go out alone, and do shopping for groceries and prescriptions, but that she has trouble concentrating and remembering things. AR 161-62. According to Shead-Gonzalez, Good Face visits with friends and family daily, but does not have any other social activities. She no longer sews or plays bingo because these activities are too tiring. AR 162. She cannot be away from home for very long because she gets tired and needs to lie down. AR 163. Shead-Gonzalez reported that Good Face can walk 50-100 feet before needing to rest for 5-10 minutes. AR 163.

Good Face bases her claim for DIB and SSI on heart problems, diabetes, obesity, peripheral artery disease, and depression. AR 107-08. She is 5'4" and weighs around 200 pounds. AR 490. She smoked for twenty years, but stopped smoking just before her heart surgery in May 2004. AR 190, 499. She

has a history of peripheral vascular disease, which was treated with a femoral embolectomy and femoral reconstruction on her right leg on January 9, 2002, AR 189, 190, and intermittent problems with edema of the lower extremities. AR 189, 190, 241, 248.

On May 16, 2004, the alleged disability onset date, Good Face presented to the emergency room at Flandreau Medical Center in Flandreau, South Dakota, complaining of shortness of breath and swelling and tightness of her legs and abdomen. AR 241. She was admitted for observation and diagnosed with edema. AR 241. A cardiac catheterization on May 19, 2004, showed severe global hypokinesis with markedly reduced left ventricular function with an ejection fraction of 20 percent. AR 178, 187.

Good Face underwent coronary artery bypass surgery to four vessels on May 24, 2004, at the Heart Hospital of South Dakota in Sioux Falls, South Dakota. AR 182-84. Dr. James R. Reynolds, who performed the procedure, noted that she was depressed and slow to return to activity following the surgery. AR 178. Good Face was discharged on May 31, 2004. AR 178. Her postoperative diagnoses were severe coronary artery disease, severe left ventricular dysfunction, and moderately severe mitral regurgitation. AR 182.

Good Face received follow-up care from her primary care provider, Dr. Gary L. Bruning, at Flandreau Medical Center, following her May 2004 heart surgery. On June 22, 2004, Good Face reported that the Prozac she was

taking was not helping her depression.  Dr. Bruning discontinued Good Face's use of Prozac and prescribed Paxil instead.  AR 226.

Good Face saw cardiologist Dr. Mark R. Gordon at North Central Heart Institute in Sioux Falls, South Dakota, on July 29, 2004.  Dr. Gordon reported that Good Face was doing progressively better.  She had less and less shortness of breath, was not having any prolonged chest pain, and participated in cardiac rehabilitation.  But Good Face reported that she was not feeling very energetic and experienced occasional dizziness.  An echocardiogram showed her ejection function had improved from 20 percent before the surgery to 35-40 percent.  Dr. Gordon characterized her reduced left ventricular function as mild to moderate.  Dr. Gordon also found only trivial residual mitral regurgitation, and he diagnosed Good Face with trace mitral insufficiency.  An examination of Good Face's extremities revealed no edema.  AR 263-64.

Good Face complained about bilateral foot pain at an appointment to monitor her diabetes at Flandreau Medical Center on September 22, 2004.  She denied rashes, skin breakdown, and pain in her feet, but reported pain in her toes.  She told physician assistant Cindy Deutscher that she experienced pain or a tightening sensation in her calves after walking short distances. Deutscher noted that her feet were warm and pink.  Deutscher talked with Good Face about how her foot pain was related to her diabetes.  AR 295-96.

6

The medical record does not indicate whether Deutscher informed Good Face of any restrictions on physical activity.

On October 18, 2004, Good Face saw Dr. J. Michael Bacharach at North Central Heart Institute and complained of numbness and tingling in her feet. She described the feeling as like electric shock, particularly at bedtime. She also stated that her feet were cold. Good Face reported that she had been walking regularly and going to the gym three days a week. Dr. Bacharach conducted a duplex ultrasound, color flow, and Doppler of a bifemoral graft and a lower extremity arterial exam. He found that there was no significant compromise of Good Face's vasculature. He believed that Good Face's symptoms were caused by peripheral neuropathy related to her diabetes and prescribed Elavil. AR 277-82. The medical records do not contain any indication of Dr. Bacharach's instructions to Good Face.

Good Face underwent an outreach echocardiogram at Avera McKennan Hospital in Sioux Falls, South Dakota, on November 11, 2004. Dr. Raymond H. Allen found normal left ventricular function, with an ejection fraction of approximately 50 percent. He also found evidence of elevated left ventricular and diastolic pressure and left atrial enlargement. Dr. Allen saw no mitral regurgitation. AR 286.

On January 3, 2005, Good Face had another outreach echocardiogram. Dr. Gordon concluded that she had mild right ventricular enlargement, mild

7

left atrial enlargement, trace mitral insufficiency, mild tricuspid insufficiency with normal estimated pulmonary artery pressures, and left ventricular systolic function at the lower limits of normal to mildly reduced. Her estimated ejection fraction was 50 percent. AR 283-84.

Good Face presented at Flandreau Medical Center with a variety of ailments in the beginning of 2005. On February 15, 2005, she complained of pain along the incision in her right leg from her May 2004 surgery. She also complained of some numbness in her feet. Dr. Bruning prescribed Cymbalta to treat both the foot pain and numbness and Good Face's emotional problems. AR 293. On February 19, 2005, Good Face reported to Dr. Bruning that her leg pain had improved quite a bit. AR 293. At her appointment for diabetic follow up on March 22, 2005, Good Face reported that she felt much better on Cymbalta. She had no foot or leg pain, and her mood was improved. She did report some numbness in her left hand, which Dr. Bruning characterized as unremarkable and probably attributable to neuropathy from diabetes. AR 292.

Good Face went to Flandreau Medical Center on April 23, 2005, complaining of severe discomfort in her right arm. She had a fracture of the right humerus and was given pain medication. AR 289.

Good Face saw Dr. Bruning on July 6, 2005. She complained of fluttering in her chest and on-and-off numbness in her right arm. Dr. Bruning found no ankle edema. AR 289. Good Face was analyzed for twenty-four

hours with a Holter Monitor.  The procedure showed that Good Face had
cardiac arrhythmia.  AR 290.

On September 27, 2005, Good Face was diagnosed with a partial tear of
her posterior cruciate and a possible tear of her anterior cruciate in her right
knee.  AR 306.

A North Central Heart Institute record dated December 20, 2005,
indicates that Good Face had recently been hospitalized at the Flandreau
Hospital for worsening exertional dyspnea.  She could not walk more than fifty
feet without feeling significantly short of breath.  Good Face was placed on
increased diuretic therapy and felt better but not back to baseline.  AR 310.
The records provided by Flandreau Health Center and Avera McKennan
Hospital in Flandreau do not appear to document this hospitalization.

An echocardiogram performed on December 20, 2005, at Avera
McKennan Hospital revealed mild biatrial enlargement, mildly reduced left
ventricular function with an estimated ejection fraction of 40-45 percent, no
evidence of mitral regurgitation, mild tricuspid regurgitation, and mild
pulmonary hypertension.  AR 311-12.  Dr. David A. Swanson performed a
stress test on January 23, 2006.  He concluded that although significant
stress-induced ischemia was not indicated, the test did suggest global
hypokinesis with more pronounced reduction in wall motion in the inferior

wall, dilated appearance of the left ventricle, and a left ventricular ejection fraction of 26 percent.  AR 315.

In October 2006, Good Face was treated for pain in her legs.  On October 22, 2006, Good Face presented to the Flandreau Medical Center emergency room complaining of bilateral leg discomfort and intermittent swelling.  Physician assistant Deutscher observed mild bilateral edema and some skin breakdown on the right great toe.  She believed that the leg aching was caused by Good Face's peripheral artery disease.  AR 320.  On October 23, 2006, Good Face underwent a noninvasive arterial exam of the legs and arms. The brachial index and Doppler waveform suggested that Good Face had mild arterial occlusive disease (another name for peripheral vascular disease) on the left.  AR 323.  Another examination showed no indications of blood clotting. AR 363.

Good Face presented to the North Central Heart Institute on October 26, 2006, complaining of discoloration and severe pain in her lower legs and feet. She reported that her toes and feet became purple when she sat down and sometimes when she was standing.  The discoloration would go away if she elevated her feet.  Good Face described the pain as an electrical zap feeling. Certified nurse practitioner Kelly Wasko observed that Good Face's feet were warm and pink when elevated, but took on bluish tones when not elevated. The bluish tone was present on both feet, but worse on the left.  Good Face's

toes to the left foot were cold to the touch.  Wasko discussed Good Face's condition with Dr. Bacharach, who believed that Good Face was experiencing atheromatous embolization.  Good Face was scheduled for a CT scan of her aortic graft, and Wasko discussed the importance of good foot care and keeping her feet warm.  Wasko's report does not indicate that she informed Good Face to keep her feet elevated.  AR 325-26.  The CT scan was performed on October 27, 2006, at Avera McKennan Hospital.  Dr. Valdis A. Dzintars observed a mild narrowing of several arteries.  AR 328.

Good Face's records at Flandreau Medical Clinic indicate that her mother called on January 16, 2007, to report concerns about Good Faith's mental health.  Her mother said that Good Face had been calling her nightly while crying, and that she did not know why she was crying.  Dr. Bruning prescribed Wellbutrin in addition to the Cymbalta Good Face was already taking.  AR 365.

Good Face was admitted to the South Dakota Human Services Center in Yankton, South Dakota, on February 3, 2007, after she attempted to overdose on Paxil and Amitriptyline on February 2, 2007.  AR 330-31, 334.  She was hospitalized for nine days before being discharged on February 12, 2007.  Dr. Ramesh B. Somepalli reported that Good Face's mood improved rapidly during her hospital stay.  She consistently denied suicidal thoughts or plans, and stated that her suicide attempt was an impulsive act secondary to her financial and other life problems.  She showed no psychotic symptoms such as

11

hallucinations or delusions.  Good Face was cooperative and pleasant with staff members.  She initially isolated herself but began participating in ward programs and groups at the end of her stay.  She articulated plans for the future, which included continuing with outpatient care and spending time with her pets and friends.  AR 332.  At the time of her discharge, Good Face's mood was euthymic and stable.  She denied feeling sad, hopeless, worthless, or suicidal.  AR 333.  Her psychiatric diagnosis at discharge was adjustment disorder with depressed mood.  Her GAF (global assessment of functioning) was 70.  AR 331.

On February 5, 2007, during her stay at South Dakota Human Services Center, Good Face complained of swelling in her hands and arms.  Physician assistant Renee Boehrns observed increased swelling to the left hand and lower forearm, possibly related to the placement on an IV in that arm when Good Face was first admitted.  Good Face had moderate nonpitting edema of the right hand and pitting edema to the lower left arm and left hand.  She did not complain of pain or palpation of either arm.  AR 343.  Dr. John Frank examined Good Face the same day and also observed mild redness and swelling of the left arm and hand.  He advised Good Face to apply warm packs four times daily and to elevate her left arm.  AR 347.

Good Face was seen in the Flandreau Medical Center emergency room on March 12, 2007, with cellulitis of her leg.  She called the Center on March 14,

2007, to report that she was feeling much better and that her leg was not tender, red, or swollen.  AR 364.

On June 16, 2007, Good Face presented to the Flandreau Medical Center complaining of chest pain and the abrupt onset of left-sided numbness.  AR 382, 388.[1]  She was transferred by ambulance to Avera McKennan Hospital for further evaluation.  AR 380.  At the time of her arrival at Avera McKennan Hospital, she was pain-free but had extensive erythema.  AR 380.  She had taken aspirin prior to her arrival at the emergency room, and she reported an allergy to this medication.  AR 388-89.  Venous Dopplers were done on her left leg, but no problems were identified.  AR 380.  A CAT scan of Good Face's brain showed no sign of neurological deficits.  Good Face's white blood count was elevated, so she was admitted on June 17, 2007.  While being examined, Good Face indicated that she was experiencing a lot of pain in her left hip and shoulder.  AR 382.  Red hives covered her right shin and both legs were warm to touch and slightly swollen.  AR 382.  Infectious disease specialist Dr. M.

---

[1]The records from Avera McKennan Hospital and Flandreau Medical Center dated June 16, 2007, and later were considered by the Appeals Council, but were not in the administrative record when the ALJ issued his decision. See AR 6, 10.  Because the Appeals Council considered the new records and declined review, the court "must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000) (per curiam) (citing Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995)).

13

Rabiul Alam examined Good Face on June 17, 2007.  He identified right leg cellulitis, pyelonephritis, and pneumonia as possible diagnoses.  AR 385-87.

An echocardiogram performed on June 17, 2007, showed a mildly dilated left ventricle with reduced left ventricular function.  The ejection fraction was approximately 35-40 percent.  The procedure also showed biatrial enlargement and trivial to mild mitral regurgitation.  The physician noted that the echocardiogram was a technically difficult study with poor image quality.  AR 398-99.  Good Face was discharged on June 19, 2007.  AR 388.  The medical records from Avera McKennan Hospital do not document any instructions Good Face was given on after-care or physical limitations.

Several of Good Face's physicians have documented concerns about her ability to work.  In a letter dated September 17, 2004, Dr. Gordon, Good Face's cardiologist, stated "[w]e just did a recent stress test and she has very poor exercise tolerance.  Therefore, I think that any type of job that she were to have should be one that does not require any significant degree of physical exertion.  Ideally, a desk-type job would be best for her."  Dr. Gordon indicated that he could be reached by telephone with any specific questions about restrictions on work for Good Face.  AR 317.

Dr. Bruning, Good Face's primary care provider, wrote on June 16, 2004, that Good Face has multiple disabling medical problems and should be

14

considered for total disability.  AR 319A.  On August 30, 2004, Dr. Bruning
wrote:

> Given this patient's history of peripheral artery disease and bypass
> grafting at this point in time I do not believe that she is capable of
> working with anything requiring manual labor.  She has a good
> deal of instability with her blood sugars, which require a constant
> monitoring; and given the multiplicity of her problems, I don't
> think that working as a hostess is feasible.

AR 319.  Finally, Dr. Bruning swore by affidavit on June 12, 2006, that Good
Face has been treated for congestive heart failure and diabetes, that these
conditions have lasted for twelve months and should last indefinitely, and that
within a certain degree of medical probability, Good Face is unable to obtain
any employment.  AR 318.

## ALJ HEARING

At the ALJ hearing held on March 29, 2007, Good Face appeared,
represented by counsel.  Good Face testified that she lives in a duplex in
Flandreau with her 19-year-old daughter.  AR 470.  She later clarified that her
daughter attends college in Kansas, but comes back to Flandreau when she
can.  AR 491.  Good Face testified that her primary means of financial support
is her daughter's per capita share from her American Indian tribe.  AR 493.
Good Face's daughter pays the bills from this money, and Good Face does not
have any other sources of income.  AR 493.

With respect to the activities of daily living, Good Face testified that she
tries to do as much cleaning as she can, but she has to take several breaks

while vacuuming.  Her daughter does most of the cleaning when she comes home.  AR 482.  Good Face does not do snow removal or maintain her yard.  AR 486.  Her daughter or neighbor helps with these tasks.  AR 487.  Good Face prepares cereal for breakfast and a sandwich for lunch, but did not testify to doing any other cooking.  AR 482-83.  She stated that lifting a gallon of milk is a two-handed job.  AR 486.  Good Face testified that she takes several rests throughout the day, including a morning nap and a break in the afternoon to elevate her legs.  AR 482-83.  She elevates her legs to alleviate discomfort and swelling and to help her circulation.  AR 483.  Good Face also testified that she does not use a computer because her hands go numb easily.  AR 484.  Good Face testified that she walks to the mailbox once a day, a distance of fifteen to twenty yards, and has to stop to rest when she gets there.  AR 484.  She has to use a motorized cart to get around stores.  AR 485.  Good Face testified that she experiences leg pain or numbness every day for about three-quarters of the day.  AR 487-88.

Good Face's attorney and the ALJ asked whether her doctors had given her any information or instructions about physical limitations resulting from her medical problems.  Good Face indicated that Dr. Gordon told her not to lift over twenty pounds or to keep her arms raised above her head.  AR 475, 498.  Dr. Gordon told her this right after her heart surgery in 2004, but Good Face testified that she understood the physical limitation to be a long-term one.  AR

16

498.  Good Face also testified that Dr. Bacharach told her to keep her feet elevated as much as possible after her surgery in 2002.  AR 498.  She also reported that her heart surgeon, cardiologist, and primary care provider told her that her diabetes contributed to her heart conditions.  AR 477.

Good Face also testified that she manages her type II diabetes by checking her blood sugar four times a day and taking long-acting insulin at night.  AR 476.  Dr. Gordon and Dr. Bruning monitor her congestive heart failure through regular check-ups, conduct regular cardiac catheterizations, and prescribe medication to her.  AR 478-79.  With respect to her depression, Good Face testified that she had an appointment with Dr. Bruning after being discharged from South Dakota Human Services Center.  She was also referred to a counselor, but had not had a session with the counselor due to bad weather.  AR 480-81.  Good Face indicated that she is taking Crestor, Aceon, Cymbalta, Coreg, potassium, furosemide, Lantus insulin, Humalog, and a multivitamin.  AR 479.  She is not taking any pain relief medication.  AR 496.

Vocational expert William Tucker also testified.  He stated that based on Good Face's testimony, she would not be able to do any of her past work.  AR 507.  Considering her testimony that she could stand less than ten minutes and walk only twenty yards and that she required up to two hours of rest in the afternoon, she would not be able to do any work on a full-time basis.  AR 507.  Tucker also testified that a person with the same age, education, and

17

work experience as Good Face who could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit with normal breaks for about six hours of an eight-hour workday, and who had unlimited push/pull capacity, no postural limitations, and no manipulative, visual, communicative, or environmental limitations would be able to do all of Good Face's past work except for one of her cashier positions.  AR 507-08.  Finally, Tucker testified that a person with these characteristics and capabilities with the ailments described by Good Face in her testimony would not be able to work any jobs on a full-time basis.  AR 508.

The ALJ left the record open for ten days for Good Face to provide more recent medical records because the ALJ did not have any records after October 2006.  AR 503, 509.  After the hearing, the ALJ received a record from Avera McKennan Hospital detailing the bilateral venous Doppler examination Good Face underwent on October 23, 2006, and records from Flandreau Medical Center from November 17, 2006, through March 12, 2007.  AR 363-67.  The Appeals Council also had before it the Avera McKennan Hospital records from Good Face's June 16-17, 2007, stay, which involved chest pain, numbness, and elevated white blood cell count.  AR 380-410.

## ALJ DECISION

After applying the sequential five-step evaluation process,[2] the ALJ concluded that Good Face was not entitled to DIB or SSI in a written decision dated May 8, 2007.  First, the ALJ concluded that Good Face had not engaged in substantial gainful activity since the amended onset date of May 16, 2004.  AR 18.  Second, the ALJ determined that Good Face's coronary artery disease, history of mitral valve regurgitation, mild arterial occlusive disease, type II diabetes mellitus with peripheral neuropathy, and obesity were severe impairments.  AR 18.  The ALJ concluded that Good Face's right humerus fracture, right knee injuries (partial tear of the right posterior cruciate and possible tear of the anterior cruciate), and adjustment disorder with depressed mood were non-severe.  AR 18-19.  Third, the ALJ found that the severity of Good Face's impairments did not meet or equal a medical listing.  AR 19.

---

[2] "To determine disability, the Commissioner uses the familiar five-step sequential evaluation, [and] determines: (1) whether the claimant is presently engaged in a 'substantial gainful activity'; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform."  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (internal footnote omitted).

The ALJ next determined that Good Face had the residual functional capacity to lift and/or carry twenty pounds on an occasional basis and ten pounds on a frequent basis, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, and sit (with normal breaks) for a total of about six hours in an eight-hour workday. AR 19. The ALJ found that Good Face's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible in light of the record as a whole. AR 21.

The ALJ identified numerous inconsistencies in the record which eroded the credibility of Good Face's alleged limitations. Good Face stated during the hearing that her daughter cleans the house, and later testified that her daughter attends college in Kansas. Moreover, Good Face claimed to receive help from her mother, who also lives in Kansas. Good Face's testimony that she cares for her cats and dogs and the fact that she lives independently most of the time in Flandreau erode the credibility of her alleged limitations. AR 21. Additionally, the statements of third parties regarding Good Face's abilities and limitations were inconsistent with each other and with Good Face's report of her own limitations. Good Face's sister stated that Good Face prepares meals, drives, shops, visits friends and family daily, and cares for her daughter. On the other hand, Good Face's friend stated that Good Face cannot prepare

meals, drive, or go shopping.  AR 22.  Further, Good Face's testimony about her inability to function at her last job as a general clerk was inconsistent with the employer's report that she had exceptional attendance and did not require frequent breaks, rest periods, or time off for health reasons.  AR 22.

The ALJ also found numerous material inconsistencies and incongruities between Good Face's subjective complaints and the documentary evidence in the record.  The record indicates improvements in Good Face's heart condition following her May 2004 surgery.  AR 22-23.  A January 23, 2006, exam showed left ventricular ejection fraction of 26 percent, close to the ejection fraction shortly before the surgery, and the ALJ found that the record did not show a significant and sustained deterioration in Good Face's cardiac condition.  AR 23.  The ALJ found it significant that Dr. Gordon did not recommend additional surgery or follow-up and did not provide an opinion on Good Face's disability.  AR 23.  The record also indicates improvements in Good Face's leg pain and numbness.  In March 2005, her peripheral neuropathy was doing much better after she began taking Cymbalta.  AR 23.  Moreover, there is no medical opinion in the record regarding Good Face's claim that she has to elevate her legs or avoid elevating her arms.  AR 23.  Indeed, Dr. Frank instructed Good Face to elevate her left arm to relieve the pain and swelling she reported during her stay at South Dakota Human Services Center in February 2007.  AR 23.

The ALJ discounted the opinions of Dr. Bruning because they are based on Good Face's subjective complaints and not on medically acceptable clinical and laboratory diagnostic techniques.  Additionally, Dr. Bruning's opinions are internally inconsistent.  Dr. Bruning stated in July 2004 that Good Face should be considered for total disability, in August 2004 that Good Face is unable to perform manual labor, and in June 2006 that Good Face is unable to obtain any employment.  Moreover, Dr. Bruning's conclusory opinions regarding Good Face's inability to work go to an issue reserved to the Commissioner.  AR 24.  Rather, the ALJ gave probative weight to the conclusions of the non-examining medical consultants that Good Face was able to lift and/or carry twenty pounds on an occasional basis and ten pounds on a frequent basis, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  AR 24.

Finally, the ALJ found that Good Face was capable of performing all of her past relevant work as a cashier, restaurant hostess, medical assistant, phlebotomist, motel cleaner, and general clerk.  The ALJ did not reach the fifth step of the analysis, and concluded that Good Face had not been under a disability as defined in the Social Security Act from May 16, 2004, to the date of the decision.

22

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the record supports it as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Further, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); see also Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).  The court must review the Commissioner's

decision to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

### I.    Weight Given to Opinions of Treating Physicians

Good Face argues that the ALJ erroneously failed to give controlling weight or to identify what weight was given to the opinions of treating physicians Dr. Bruning and Dr. Gordon.  The court finds that the ALJ did not err in discounting Dr. Bruning's opinions, but that the ALJ erred in not recontacting Dr. Gordon before discounting his opinion.

A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006).  "A treating physician's opinion

24

'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).  An ALJ's decision to discount or disregard the opinion of a treating physician may be upheld where "other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id. (citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).  Moreover, a treating physician's opinion on an issue reserved for the Commissioner, such as whether the claimant is disabled or unable to work, should not be given controlling weight.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  An ALJ's decision that the treating physician's opinion is not entitled to controlling weight does not mean that the opinion should be rejected.  Rather, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [the regulations][3]."  Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, Soc. Sec. Rul. (SSR) 96-2p (1996).  The ALJ must always give good reasons for the weight

---

[3]These factors are: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

afforded to a treating physician's evaluation.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

 The regulations impose a duty on the ALJ to recontact treating physicians when the evidence received from them is inadequate for the ALJ to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1512(e), 416.912(e) (2006).  The duty applies both when the treating physician has supplied an opinion on the nature and severity of the claimant's impairments, Ellis, 392 F.3d at 994, and when the treating physician has issued an opinion on matters reserved to the Commissioner.  Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, SSR 96-5p (1996).  But the requirement that an ALJ recontact a treating physician is not universal.  Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).  It only applies when a crucial issue is undeveloped.  Ellis, 392 F.3d at 994.  For example, an ALJ erred by failing to recontact a treating physician to locate the residual functional capacity assessment the physician relied on and to determine what functional restrictions applied to a work release signed by the treating physician.  Coleman v. Astrue, 498 F.3d 767, 771 (8th Cir. 2007). On the other hand, "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable." Hacker, 459 F.3d at 938.

 **A.** **Dr. Bruning**

26

The ALJ considered Dr. Bruning's opinions and concluded that they were not well supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other substantial evidence in the record. AR 24.  Specifically, the ALJ reasoned that Dr. Bruning's opinions were based on Good Face's subjective complaints, that his treatment notes reflected none of the physical limitations Good Face testified to, that his opinions were inherently inconsistent as they changed over time, and that his conclusory opinion that Good Face was unable to work went to an issue reserved to the Commissioner.  AR 24.  Therefore, the ALJ did not give Dr. Bruning's opinions controlling weight.  AR 24.  Good Face argues that the ALJ failed to articulate any good reasons for discounting Dr. Bruning's opinions and that the ALJ should have recontacted Dr. Bruning to determine the basis of his statement that she was unable to work.  Morever, Good Face argues that the ALJ erred by failing to identify the weight given to Dr. Bruning's opinions.

The court finds that the ALJ rightly discredited Dr. Bruning's opinion that Good Face was disabled and could not work and that the ALJ was under no duty to recontact Dr. Bruning for explanation of his opinion.  The ALJ correctly pointed out that none of Dr. Bruning's treatment notes contained any indication that Good Face should restrict her physical activity, elevate her legs, or avoid elevating her arms.  Where a treating physician never orders or suggests to the claimant that she avoid certain physical activities and never

27

cautions the claimant that these activities could aggravate her health problems, the physician's opinion that the claimant cannot engage in these activities is not supported by medical evidence in the record.  Ellis 392 F.3d at 995.  The ALJ may properly discredit the opinion.  Id.; see also Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (ALJ did not err in discounting portions of physician's medical source statement where limitations in the statement were never mentioned in physician's numerous records of treatment and were not supported by objective testing).

Here, there is no record that Dr. Bruning informed Good Face that she should restrict walking, elevate her legs for several hours a day, or avoid returning to work.  Indeed, none of his opinions indicate any specific reasons why Good Face was unable to perform manual labor as indicated in his August 30, 2004, letter, or obtain any employment at all as indicated in his June 12, 2006, affidavit.  The silence in Dr. Bruning's treatment records about Good Face's physical limitations and her ability to return to work renders his opinions inconsistent with the other evidence in the record.  Further, the fact that Dr. Bruning's assessment of Good Face's ability to work changed over time makes his opinions inherently inconsistent.  Although changes in Good Face's physical condition over time may explain some of the changes in Dr. Bruning's opinions about her ability to work, nothing in the record explains why she was capable of performing non-manual labor three months after undergoing heart

28

surgery and not capable of working any jobs almost two years later.  Because Dr. Bruning's opinion that Good Face was unable to obtain employment was not supported by medically acceptable clinical or laboratory diagnostic techniques and was inconsistent with other evidence in the record (including Dr. Bruning's own prior opinions), the ALJ did not err in refusing to give it controlling weight.

Nor did the ALJ err in failing to articulate the exact amount of weight he gave Dr. Bruning's opinions.  The regulations do not require an ALJ to identify the exact weight he gives to a physician's opinion, but only that the ALJ give good reasons for the weight he does give.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The amount of weight can be inferred from the ALJ's reasoning and conclusions.  See Ellis, 392 F.3d at 994 (finding that ALJ gave some credit to physician's medical opinions based on residual functioning capacity assessment).

Good Face argues that the ALJ should have recontacted Dr. Bruning to determine the basis of his opinions rather than dismissing them as conclusory and involving an issue reserved for the Commissioner.  The duty to recontact a treating physician only arises if a crucial issue is undeveloped.  Ellis, 392 F.3d at 994.  In Ellis, the ALJ did not err in failing to recontact a treating physician because the claimant did not allege that the record was missing any relevant medical records, the ALJ held the record open for thirty days after the hearing

29

to allow the claimant to supplement it, and the claimant asserted that the record was sufficiently developed to support the physician's opinion.  Id. Because the claimant did not inform the court what additional medical evidence should be obtained from the treating physician, the claimant failed to show the prejudice required to remand the case for additional evidence.  Id.

Here, like the claimant in Ellis, Good Face does not argue that the record is missing any medical records from Dr. Bruning that would further explain the basis of his opinions.  Also, the ALJ left the record open for ten days after the hearing for Good Face to provide missing records.  Good Face provided several supplemental documents, but did not identify any records that were still missing.  The ALJ did not discredit Dr. Bruning's opinions because they were incomplete.  Rather, he discredited them because they were not based on medical evidence and were inconsistent with the other evidence in the record. Because Good Face has not informed the court what critical issue remains undeveloped with respect to Dr Bruning's opinion, the ALJ did not err in not recontacting this physician.

**B.    Dr. Gordon**

The ALJ also addressed the opinion of Dr. Gordon that Good Face is unable to perform any jobs requiring significant physical exertion.  Without explicitly refusing to give Dr. Gordon's opinion controlling weight, the ALJ concluded that Good Face's heart condition improved after surgery.  The ALJ

30

reasoned that the record does not show a significant and sustained deterioration in Good Face's cardiac condition, the record contains no indication that Dr. Gordon recommended additional surgery or other follow-up procedures, and Dr. Gordon provided no opinion of the claimant's disability.[4] Good Face argues that the ALJ erred in failing to assign weight to Dr. Gordon's opinion and to recontact him for additional information.

The court finds that the ALJ erred in failing to recontact Dr. Gordon. Unlike with Dr. Bruning, where the ALJ discounted his opinion because it was not supported by medical evidence and was inconsistent with other evidence in the record, the ALJ apparently rejected Dr. Gordon's opinion because there was a lack of evidence in the record. The ALJ identified as a crucial issue whether there had been a significant and sustained deterioration in Good Face's cardiac condition, and found it noteworthy that there was no opinion from Dr. Gordon on this issue. Although the ALJ noted the results of Good Face's follow-up testing from May 2004 through January 2006—showing an improvement in left ventricular ejection fraction from 20 percent before heart surgery to 40-45 percent in December 2005, then a decrease to 26 percent in January 2006[5]—it

---

[4] Curiously, the ALJ discredited Dr. Gordon's opinion partly on the fact that Dr. Gordon provided no opinion of Good Face's disability. But the ALJ acknowledged the letter written by Dr. Gordon, dated September 17, 2004, which is inconsistent with this conclusion.

[5]The record contains the results of an echocardiogram performed on June 17, 2006, showing an ejection fraction of 35-40 percent. AR 398-99.

is implicit in the ALJ's opinion that he did not have adequate information to determine whether there had been a significant and sustained deterioration in Good Face's cardiac condition.  The case was remanded to the ALJ with instructions from the Appeals Council to determine whether there had been such a decline in Good Face's condition in light of the results of the January 2006 test.  On remand, however, the ALJ did not reference any evidence regarding Good Face's cardiac condition after January 2006.  Because the ALJ did not have adequate evidence to determine whether Good Face's reduced ventricular function rendered her disabled, the ALJ should have recontacted Dr. Gordon to seek additional evidence or clarification of his earlier opinion. See 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

## II.   Evaluation of Subjective Complaints of Pain and Other Symptoms

Good Face also argues that the ALJ erred in finding her subjective complaints of pain and other symptoms not credible.  The court finds that the ALJ properly discounted Good Face's subjective complaints and will not disturb the ALJ's credibility determination.

In weighing a claimant's subjective complaints of pain, the ALJ should analyze the factors set out in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Under Polaski, "[t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the

---

This document was not available to the ALJ at the time of his decision.

claimant's prior work record, and observations by third parties and treating
and examining physicians relating to such matters as: 1. the claimant's daily
activities; 2. the duration, frequency and intensity of the pain; 3. precipitating
and aggravating factors; 4. dosage, effectiveness and side effects of medication;
5. functional restrictions." Id.; see also Choate v. Barnhart, 457 F.3d 865, 871
(8th Cir. 2006). The ALJ need not, however, "discuss each Polaski factor as
long as the analytical framework is recognized and considered." Tucker v.
Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). Additional considerations
include the claimant's relevant work history and the absence of objective
medical evidence to support the severity of claimant's symptoms. See Choate,
457 F.3d at 871. Without more, lack of objective medical evidence does not
support discounting a claimant's subjective complaints. See Goff v. Barnhart,
421 F.3d 785, 792 (8th Cir. 2005).

After considering the Polaski factors, the ALJ must make an "express
credibility determination." Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir.
2004). Inconsistencies between the claimant's subjective complaints and the
evidence as a whole may warrant an adverse credibility finding. See Pelkey v.
Barnhart, 433 F.3d 575, 578 (8th Cir. 2006). The ALJ must, however, state
why the record as a whole supports an adverse credibility determination. See
Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). "[T]he duty of the court
is to ascertain whether the ALJ considered all of the evidence relevant to the

plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson, 363 F.3d at 738-39. The court " 'will not disturb the decision of an ALJ who considers, but for good cause discredits, a claimant's complaints of disabling pain.' " Goff, 421 F.3d at 792.

The ALJ did not cite to Polaski, but he did set out the factors identified in 20 C.F.R. §§ 404.1529(c) and 416.929(c) (2006) before analyzing the credibility of Good Face's allegations and subjective complaints. AR 20. It is the preferred practice in the Eighth Circuit to explicitly cite Polaski, but courts may uphold the analysis of an ALJ who cites and conducts an analysis pursuant to the regulations, which set out factors that largely mirror the Polaski factors. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007). The ALJ considered the entirety of the record and found Good Face's statements about the intensity, persistence, and limiting effects of her symptoms not entirely credible. AR 21.

The ALJ noted numerous inconsistencies in the record that support his conclusion that Good Face's testimony about the limiting effects of her medical problems was not credible. First, despite Good Face's allegation that she needs assistance with cleaning and other household activities, Good Face lives alone in Flandreau and takes care of her cats and dogs. Her daughter lives in a

dormitory in Kansas[6] and her mother lives in Kansas.  These facts undermine the credibility of Good Face's testimony that she is unable to clean, cook, and perform other daily activities.

Second, the statements of third parties regarding Good Face's limitations were inconsistent with Good Face's testimony.  Good Face's sister reported, just months after Good Face's heart surgery, that Good Face prepared meals, drove, shopped, watched television, read, and visited friends and family daily. Good Face's sister, who spoke with Good Face by telephone every day, reported that Good Face was able to perform far more activities of daily living than Good Face and Good Face's friend testified to.  Good Face's friend reported that, among other limitations, Good Face could not drive or shop.

Third, Good Face's report that she had to miss work and take frequent breaks due to swelling of her legs, feet, and abdomen after her January 2002 surgery was inconsistent with her employer's assessment of her reliability and attendance.  The store manager reported that Good Face's attendance record was exceptional, and she did not require frequent breaks, rest periods, or time

---

[6]Good Face argues that she was never untruthful about the fact that her daughter attends college in Kansas.  The court agrees with Good Face on this point, but still finds it significant that her daughter lives away from Flandreau most of the time.  It is not the fact that Good Face attempted to conceal the real living situation of her daughter that undermines her credibility.  Rather, it is the fact that Good Face lives alone in Flandreau except for college breaks, holidays, and some weekends that undermines the credibility of Good Face's assertion that she cannot take care of herself or her home.

off for health reasons.  She was a cheerful, loyal, and dependable employee.
The inconsistency between the store manager's evaluation of Good Face and
her account of missing work and taking frequent breaks undermines the
credibility of her allegations regarding her physical and vocational limitations.

Finally, the ALJ noted numerous material inconsistencies and
incongruities between Good Face's subjective complaints and her medical
records.  In contrast to Good Face's complaints about her leg and arm pain and
numbness and difficulties walking, Dr. Gordon noted improvement in Good
Face's cardiac condition after her heart surgery in May 2004.  Good Face
reported to physicians in October 2004 that she was walking regularly and
going to the gym three days a week.  The record also indicates that in March
2005, Good Face's leg pain and numbness were doing much better after she
started taking Cymbalta.  Further, despite records of Doppler examinations, CT
scans, and angiograms, there is no medical opinion indicating that Good Face
has to elevate her legs or avoid elevating her arms.  Moreover, a physician at
South Dakota Human Services Center instructed Good Face to elevate her left
forearm to alleviate pain and swelling.  All of the medical records indicating
improvement and progress in Good Face's condition are inconsistent with her
allegations that she must elevate her legs several hours a day and avoid lifting
her arms and that she has difficulty walking and lifting.  Given these
inconsistencies, the ALJ found that Good Face's statements concerning the

36

intensity, duration, and limiting effects of her symptoms are not entirely credible.  The ALJ apparently gave some weight to Good Face's subjective complaints, as he found that she had some limitations with respect to lifting, standing, and sitting.

Considering the ALJ's findings regarding Good Face's ability to live independently, the inconsistency between her account of her work attendance and her former employer's account, and the indications in the medical records of improvement in Good Face's condition, it is apparent that the ALJ recognized and considered the <u>Polaski</u> factors as well as Good Face's complaints of disabling pain, but discredited her complaints because they were inconsistent with the record as a whole. The ALJ could properly discount Good Face's subjective complaints as not entirely credible, and the court will not disturb the ALJ's decision.  <u>See Goff</u>, 421 F.3d at 792-93 (accepting decision of ALJ to discount claimant's complaints of disabling pain because complaints were inconsistent with medical records, claimant's admitted activity level, and claimant's work history).

## III.   **Analysis of Mental Impairment**

Good Face also argues that the ALJ erred in failing to properly analyze her mental impairments and in concluding that she did not have a severe mental impairment at step two of his decision.  Because the ALJ did not conduct the psychiatric review technique required by the regulations, the court

37

finds that the ALJ's decision is not supported by substantial evidence in the record as a whole.

The regulations provide that a psychiatric review technique be applied at every level in the administrative review process when an adult alleges disability based on mental impairment. 20 C.F.R. §§ 404.1520a(a), 416.920a(a) (2006). This technique first involves determination of whether the claimant has a medically determinable mental impairment, based on pertinent symptoms, signs, and laboratory findings. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Next, the technique requires the adjudicator to rate the degree of functional limitation resulting from the mental impairment in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c), 416.920a(c). The degree of functional limitation is used to determine the severity of the mental impairment. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). If the mental impairment is found to be severe, then the adjudicator must determine whether if meets or is equivalent to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). If not, then the residual functional capacity is determined. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

The psychiatric review technique must be applied at all levels of the application process. Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007). At the initial and reconsideration levels, a standard form must be completed. 20

C.F.R. §§ 404.1520a(e), 416.920a(e) .  At the ALJ and Appeals Council levels,
"it is permissible for the analysis to be included in the written decision such
that the use of a written form is not required."  Nicola, 480 F.3d at 887.
Although the standard form is not required at the ALJ level, the ALJ must
document the application of the technique in his or her decision, and the
written decision must show the significant history and functional limitations
that were considered in determining the severity of the mental impairment as
well as a specific finding as to the degree of limitation in each of the four broad
functional areas.  20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

"Following [this] technique is not a mere formality."  Loux v. Astrue, No.
4:06CV01728 JTR, 2008 U.S. Dist. LEXIS 3793, at *13 (E.D. Ark. Jan. 17,
2008).  Failure of the ALJ to follow the psychiatric review technique and
include this analysis in the decision warrants reversal and remand.  Nicola,
480 F.3d at 887.  If the ALJ's decision does not reflect the proper analysis, the
court cannot conclude that substantial evidence on the record as a whole
supports the ALJ's determination of the severity of the mental impairment or
the claimant's residual functional capacity.  Hayes v. Apfel, 187 F.3d 641, 1999
U.S. App. LEXIS 19289, at *2 (8th Cir. 1999)( per curiam); Loux, 2008 U.S.
Dist. LEXIS 3793, at *14.

Here, Good Face alleged disability based on a mental impairment.  She
included depression in her initial disability report (AR 108), ALJ Olson found

that Good Face's affective disorder was a severe impairment (AR 37), Good Face

was hospitalized following a suicide attempt about one month before the

hearing before the ALJ (AR 480), and the ALJ discussed Good Face's mental

condition in his decision (AR 18-19).  But the ALJ did not reference or apply

the psychiatric review technique to determine if Good Face had a severe mental

impairment.  The ALJ found that Good Face's adjustment disorder with

depressed mood had not lasted and was not expected to last for a continuous

period of at least twelve months, but the ALJ did not indicate whether the

psychiatric review technique was applied, nor did he address the four broad

functional areas.  Under these circumstances, the court cannot find that the

ALJ's decision is supported by substantial evidence in the record as a whole.[7]

---

[7] The Commissioner argues that the ALJ's failure to reference the
psychiatric review technique in his decision was harmless error.  The cases
cited by the Commissioner in support of his contention are inapposite.  Trenary
v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990), merely reaffirms the
requirement that the ALJ consider the functional limitations caused by the
mental impairment through the process outlined in the regulations: "[T]he ALJ
properly focused on the functional limitations caused by those [emotional]
difficulties. . . ALJ Goustin was guided to this decision by the range of
considerations embodied in the new mental-impairment regulations."  Samons
v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007), addresses the issue of whether
the ALJ was required to make explicit findings as to the claimant's past
relevant work at step four of the analysis.  This case is irrelevant to the issue of
whether the failure of the ALJ to follow the special procedure for determining
whether a mental impairment is severe at step two causes prejudice.

Although the failure of an ALJ to follow the psychiatric review technique
was found to be harmless error where the claimant's mental impairment
caused only sporadic symptoms and the vocational expert considered these
symptoms, Cakora v. Barnhart, 67 Fed. Appx. 983, 985 (8th Cir. 2003), here

40

See Nicola, 480 F.3d at 887.  On remand, the ALJ should apply the psychiatric review technique in accordance with the procedure outlined in 20 C.F.R. §§ 404.1520a and 416.920a.  This may involve seeking the assistance of a medical expert and re-consulting the vocational expert to determine whether Good Face is capable of performing her past relevant work.  See Hayes, 1999 WL 615446, *2 ("[W]e trust the Commissioner will need to elicit further input from a vocational expert after developing the record relevant to [claimant's] mental impairment.")

## IV.    Development of Record

Good Face's final argument is that the ALJ failed to sufficiently develop the record.  Specifically, she argues that the ALJ had a duty to (1) address the status of her heart condition and whether it met a medical listing, (2) address the status of her right knee, (3) make follow-up requests for missing medical records, (4) seek more detailed input from her treating physicians, and (5) obtain additional medical input regarding her mental impairments.  The court has already addressed Good Face's arguments that the ALJ should have

---

the record shows that Good Face has been treated for depression for years. Moreover, the ALJ did not include Good Face's mental condition in his hypothetical questions for the vocational expert.  AR 506-08.  Under these circumstances, the failure of the ALJ to apply the psychiatric review technique was not harmless error.  See Montgomery v. Shalala, 30 F.3d 98, 100 (8th Cir. 1994) (finding that failure of ALJ to accurately summarize the nature of claimant's alleged mental impairments in hypothetical for vocational expert was not harmless error).

recontacted her treating physicians and followed the psychiatric review technique to determine whether she has a severe mental impairment.  With respect to Good Face's remaining arguments, the court finds that the ALJ had a duty to seek additional medical evidence on Good Face's heart condition, but did not err in failing to seek additional information on the condition of her knee or in failing to make follow-up requests for missing medical records.

The ALJ has a "duty to develop the record fully and fairly, even if, as in this case, the claimant is represented by counsel." Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984) (quoting Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983)).  Unless the claimant shows that she was prejudiced or treated unfairly by how the ALJ did or did not develop the record, however, the court will not remand.  Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).  In determining whether there is unfairness or prejudice, "it is of some relevance to us that the lawyer did not obtain (or, as far as we know, try to obtain) the items that are now being complained about." Id.

Here, Good Face has shown that the ALJ failed to develop the record with respect to her heart condition.  As noted in section I of this discussion, the case was remanded to the ALJ for determination of whether there had been a significant and sustained deterioration in Good Face's cardiac condition after a myocardial perfusion scan revealed that her left ventricular ejection fraction was 26 percent in January 2006.  The ALJ did not reference any evidence on

42

Good Face's cardiac condition after January 2006, and concluded from the lack of information from Dr. Gordon that Good Face's cardiac condition had improved.  For the same reasons that the ALJ should have recontacted Dr. Gordon, the ALJ should have requested updated records or ordered additional testing on Good Face's cardiac condition.

Good Face has also shown that the ALJ's failure to develop the record with respect to her cardiac condition was prejudicial.  At step three of the analysis, the ALJ concluded that Good Face did not have an impairment that met or equaled a medical listing.  The medical listings provide that a person is disabled if she has systolic failure with left ventricular ejection fraction of 30 percent or less during a period of stability together with certain persistent symptoms of heart failure which seriously limit the ability to engage in activities of daily living, three or more episodes of acute congestive heart failure, or inability to perform on an exercise tolerance test at a workload below five METs.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §, Listing 4.02.  Because Good Face's left ventricular ejection fraction was found to be 26 percent in January 2006, additional testing that confirmed this result as well as medical evidence of persistent heart failure, acute congestive heart failure, or inability to perform on an exercise tolerance test at the specified level may have resulted in a finding that Good Face's cardiac impairment met a medical listing. Because additional development of the record with respect to Good Face's cardiac

condition may have changed the ALJ's finding at step three, Good Face was prejudiced by the ALJ's failure to do so.  See <u>Vaughn</u>, 741 F.2d at 179 (reversing and remanding for ALJ to reevaluate the evidence against the criteria set forth in the medical listing).

On the other hand, Good Face has not shown that she was prejudiced by the ALJ's failure to inquire into her knee injury or to seek out missing records. Good Face did not allege any impairments related to her knee injury at the hearing and does not articulate any such impairments in her brief.  Further, Good Face does not identify what medical records are missing and how those records would make a difference in the ALJ's analysis.  Remand for further development of the record in these areas is not appropriate.  See <u>Onstad</u>, 999 F.2d at 1234 (finding that claimant failed to convince the court that missing records would be important enough to make a difference in the case).

**CONCLUSION**

Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Janet Good Face's claim for DIB under Title II of the Social Security Act is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS FURTHER ORDERED that the Commissioner of Social Security's decision denying Janet Good Face's claim for SSI under Title XVI of the Social Security Act is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated November 7, 2008.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE